Edward S. Conway, J.
This is an application for judgment pursuant to CPLR article 78; commanding and directing respondents, their agents, servants and employees:
1. to conduct, and cause to be conducted a blood level screening program for all children under the age of six years residing in Census Tracts 6 through 12 and 22 through 26 in the City of Albany;
2. to inspect and cause to be inspected all dwelling units within said census tracts for the existence of a lead paint hazard therein;
3. to examine into and seek abatement of all conditions of lead paint hazard in said census tracts, and in the absence of voluntary co-operation, to use all available enforcement powers and procedures to compel landlords to delead dwelling units found to contain a lead paint hazard;
4. to develop and implement, and cause to be developed and implemented forthwith a lead poisoning control program in said census tracts; and
*664 •5. to exercise forthwith their supervisory responsibilities and duties to assure the performance of all obligations required by the provisions of the Public Health Law, Sanitary Code, ' and Administrative Bules and Begulations with respect to the subject matter of this petition.
Petitioners Baldwin, Crast, Dare, Cary, Graham, Hempstead and Smith bring this proceeding as citizens and taxpayers residing in the City of Albany individually and as parents having legal custody of one or more infants of tender ages. They also bring this proceeding as a class of parents represented by them as parents of young children who reside in dwelling units located in the 190 Federal census tracts enumerated in the City of Albany where the population density is at least 20 dwelling units per acre and where most dwelling units were constructed prior to 1940 and where more than 20% are dilapidated and deteriorating and where economic and social factors are conducive to lead poisoning. Petitioners further contend that the members of the class are numerous and it is impractical to bring them all before the court and that they have a common and general interest in the outcome of this proceeding because a successful conclusion would require respondents to place into effect a program to screen and treat children for lead paint poisoning and to take action to abate those dangerous housing conditions causing the hazard of lead poisoning, all of which is required by law in order Ao protect the life and health of the members’ children from such hazard.
Petitioners’ further contentions are as follows:
Tests of paint samples from the living dwellings of most, if not all, of the individual petitioners have proven the existence of lead paint hazards.
The Albany Department of Health made certain tests to determine the existence of a lead paint hazard in certain of petitioners’ dwellings, only after one or more children had developed symptoms of lead poisoning, and upon information and belief where the existence of lead poisoning hazard was found by such paint tests, efforts subsequently undertaken by respondent Lyons, pursuant to his powers of enforcement, to compel removal of such lead paint hazard were unreasonably delayed, sporadic, informal, ineffectual and evidenced by a lack of any comprehensive plan for enforcement of applicable laws and regulations.
The respondent John Lyons is the Commissioner of Health in the County of Albany, and as the local health officer for the City and County of Albany in accordance with section 324 of the *665 Public Health Law, is charged with the enforcement of the Public Health Law and Sanitary Code of the State of New York within his jurisdiction.
Respondent Hollis S. Ingraham is the Commissioner of Health for the State of New York and' in accordance with the provisions of section 206 of the Public Health Law is charged, among other things, with the enforcement of the Public Health Law and the Sanitary Code and with exercising general supervision over the work of all local boards of health and health officers.
The New York State Legislature, recognizing that the incidence of lead poisoning in the cities of New York State constituted a major public health concern, enacted chapter 338 of the Laws of 1970, which is incorporated herein by reference and made a part hereof; and in its preamble to the said act expressed its legislative intent as follows (L. 1970, ch. 338, § 1) :
“ 1. The occurrence of the disease of lead poisoning in children has become a major public health concern. Severe lead poisoning cases result in death or mental retardation, ti is estimated that children in our nation with abnormally high blood levels of lead number in the hundreds of thousands. Many thousands of children in the cities of our state are actual or potential victims of lead poisoning. The disease of lead poisoning is most prevalent in areas of old and deteriorating housing where leaded paint and plaster in a peeling condition is accessible for ingestion by young children.
“ Lead poisoning is a disease which will require the concerted efforts of public health agencies and other agencies concerned with the availability of healthful housing for the people of our state before the disease can be brought under control and its incidence reduced,
‘ ‘ 2. The legislature therefore finds and declares that a comprehensive approach to the problem of lead poisoning is essential and that the department of health shall have the primary responsibility for development, implementation and coordination of a program to control lead poisoning by promoting research into methods of identifying areas of high risk, detecting the presence of lead in children and dwellings, stimulating professional and public education concerning the disease of lead poisoning, correction of dangerous paint conditions, and administration of state aid for local control activities.” (Emphasis supplied.)
Under section 2 of chapter 338 of the Laws of 1970, authority over lead poison control programs was conferred upon the State Commissioner of Health by the enactment of section 206 (subd. 1, *666 par. [n]) of the Public Health Law which requires the State Commissioner to: “(n) by rule and regulation establish criteria for identification of areas and conditions involving high risk of lead poisoning, specify methods of detection of lead in dwellings, provide for the administration of prescribed tests ■for lead poisoning and the recording and reporting of the results thereof, and provide for professional and public education, as may be necessary for the protection of the public health against the hazards of lead poisoning.” (Emphasis supplied.)
In accordance therewith respondent Ingraham promulgated Administrative Rules and Regulations designated as Part 67, Lead Poisoning Control (10 NYCRR Part 67), which are incorporated herein by reference and made a part hereof and which in section 67.4 required respondent Lyons to make a complete inspection of every suspect dwelling: “ (a) When a blood sample collected from a child between the ages of one and six years indicates a blood level of 40 micrograms or more of lead per 100 milliliter, or the housing conditions indicate that a dwelling could contain a lead paint hazard ”. (Emphasis supplied»)
Section 67.1 of the said Part 67 defines a lead paint hazard or paint condition conducive to lead poisoning, as follows: “ the presence of a paint or plaster in a condition accessible for ingestion or where peeling or chipping of the paint or plaster occurs or is likely to occur and which paint or plaster contains more than one percent of metallic lead based on the total nonvolatile content of the paint on interior walls, ceilings, doors, baseboards or window sills and frames of any dwelling.”
The Commissioner is empowered by subdivision 2 of section 1370 of the Public Health Law, to designate as an “area of high risk” any area “ consisting of one or more dwellings in which a paint condition conducive to lead poisoning of children is present.”
Subdivision (b) of section 67.3 of the said Part 67 defines certain criteria to be used by the State, county or city health commissioner in designating on an interim basis, ‘ areas of high risk ”, as follows:
“(1) areas where most dwellings were constructe.d prior to 1940,
“ (2) areas, where the population density is at least 20 dwelling units per acre,
“ (3) areas where more than 20 percent of the dwelings are dilapidated or deteriorating, or
(4) areas where economic and social factors are conducive to lead poisoning. ’ ’
*667 Each of the afore-mentioned Census Tracts 6 through 12 and 22 through 26, in which petitioners and members of the classes represented by petitioners reside, contains all of the criteria of age, housing, population density, deterioration and social and economic conditions conducive to lead poisoning, as set forth in section 67.3 of Part 67 of the Administrative Rules and Regulations of the State Commissioner of Health for the designation of “ areas of high risk”; all of which characteristics and housing conditions were known or should have been known to respondents Ingraham and Lyons, and should have reasonably indicated to said respondents that a significant number of the dwelling units therein could contain a lead paint hazard; and the afore-mentioned 12 census tracts should therefore have been designated, on an interim basis, “ areas of high risk ”.
Notwithstanding the above, respondents Ingraham and Lyons have arbitrarily and capriciously failed, neglected and refused to designate the afore-mentioned 12 census tracts as ‘ areas of high risk ”, contrary to the actual conditions prevailing therein, which were known to or should have been known to said respondents.
Notwithstanding the failure of respondents Ingraham and Lyons to designate the afore-mentioned 12 census tracts as “ areas of high risk ”, said respondents, having knowledge that the housing conditions, and economic and social factors existing in the afore-mentioned 12 census tracts are conducive to lead poisoning, are required by section 67.4 of ,said Part 67, with respect to all dwelling units in said tracts, to:
“ (a) * * * make or cause to be made ia complete inspection of every room, porch, public hallway or any other area where the child resides or regularly spends a significant amount of time. This inspection shall include observation for evidence of peeling, cracking, blistering or chipping of interior painted surfaces; interior and exterior window sills and frames and porches; and any painted surfaces showing evidence of biting or chewing.
“ (b) Where there is evidence of peeling, cracking, blistering or chipping of painted surfaces or chewing or biting marks, a sample of at least one gram of paint shall be collected from each surface observed. In no case shall less than two samples (one from a window sill or frame and one from a door or door frame) be collected from every room inspected, regardless of evidence of peeling, blistering, cracking or chipping paint or chewing or biting marks.
*668 “ (c) A lead detection, device approved by the State Commissioner of Health may be used in lieu of paint samples to determine the presence of lead paint.”
Part 67 further requires that the following procedure be followed upon completion of the aforesaid inspection under section 67.4:
“ 67.5 Lead paint sampling. Samples of paint shall be collected in a manner as specified by the State Commissioner of Health from each dwelling suspected to contain a lead paint hazard.
“ 67.6 Testing and reporting. The Division of Laboratories and Research or other laboratory designated by the State Commissioner of Health shall perform the examination of lead paint samples according to methods specified by the State Commissioner of Health and shall report the results of all lead paint analyses to the health unit in whose jurisdiction the samples were collected.”
Respondents Ingraham and Lyons, in violation of the provisions of sections 67.4, 67.5 and 67.6 of Part 67, have arbitrarily and capriciously failed, neglected and refused to undertake and carry out the inspection, sampling, testing and reporting of the •approximately 12,000 suspect dwellings located in the aforementioned 12 census tracts, which dwelling units said respondents knew or with the exercise of reasonable diligence should have known are likely to contain a lead paint hazard.
On or about June, 1971, members of the Albany team of Eleanor Roosevelt Developmental Services, a child advocacy program of the New York State Department of Mental Hygiene, visited and tested paint chips from 22 homes located on one block of Census. Tract 25 in the City of Albany to determine the extent of the lead paint hazard in a sample area. All dwellings visited contained peeling paint in areas accessible to children. Using a generally accepted test solution containing 1% sodium sulfide and 1% sodium hydroxide, paint chips from each apartment were placed into the solution and color changes observed which would indicate the presence or absence of lead. Thirteen or 60% of the 22 homes showed the presence of lead in a sufficient concentration to constitute a hazard to the life and health of the children residing in said apartments.
Upon information and belief, respondents Ingraham and Lyons have arbitrarily and capriciously failed, neglected and refused to initiate or plan a comprehensive program of inspection for the approximately 12,000 dwelling units in the afore *669 mentioned 12 census tracts in violation of their duty as prescribed by law.
Respondent Ingraham, furthermore, in violation of section 206 (subd. 1, par. [f ]) of the Public Health Law, has arbitrarily and capriciously f ailed, neglected and refused to require respondent Lyons to initiate a comprehensive program to inspect all dwellings in the afore-mentioned 12 census tracts constituting areas of high risk which could contain a lead paint hazard, as prescribed by law.
Respondents Conners, DeRusso, McGuire, Antonucci, Mellon, McNulty and Cahill, as members of the Board of Health of the County of Albany, which includes jurisdiction over the City of Albany, in accordance with section 308 of the Public Health Law are charged with the responsibility of directing respondent Lyons, as the local health officer for the City of Albany, in the performance of his duties.
The aforesaid respondents in violation of section 308 of the Public Health Law have arbitrarily and capriciously failed, neglected and refused to require respondent Lyons to initiate a comprehensive program to inspect all dwellings in the aforementioned 12 census tracts, constituting areas of high risk, which could contain a lead paint hazard, as prescribed by law.
Petitioners request that this court direct and require respondents Ingraham and Lyons to forthwith initiate and carry out an inspection of all suspect dwellings contained within the census tracts designated herein as high risk areas, which by reason of age, density and condition are likely to contain a lead paint hazard; that respondent Ingraham forthwith exercise his supervisory powers and responsibilities to compel the other respondents to perform such duties as are required under the Public Health Law and Administrative Rules and Regulations, and that respondents Conners, DeRusso, McGuire, Antonucci, Mellon, McNulty and Cahill, as members of the Board of Health of the County of Albany, forthwith exercise their supervisory powers and responsibilities to compel respondent Lyons to perform those duties required by law.
Hpon information and belief, no blood tests for the detection of lead poisoning were, at any time, administered to the above-named petitioners, nor to any members of the class of young children residing in Census Tracts 6 through 12 and 22 through 26, pursuant to an approved screening program promulgated by respondent Lyons in iaccordance with section 67.9 of the Administrative Rules and Regulations. The blood tests received by petitioners herein were administered only after the said peti *670 tioners, or members of their family, had become afflicted with lead poisoning and unreasonably exposed to the danger of permanent physical impairment, brain damage and death.
Upon information and belief, the names of all of the above-named petitioners, having a blood lead level in excess of 40 micrograms per 100 milliliters and afflicted with symptoms of lead poisoning, together with a substantial number of other young children, residing in the afore-mentioned census tracts, who have displayed symptoms of lead poisoning, have been duly reported to medical authorities in the City of Albany and are known to respondent Lyons.
In accordance, with the authority conferred by section 206' (subd. 1, par. .[n]) of the Public Health Law, the respondent Ingraham promulgated Part 67 of the Administrative Rules and Regulations which, among other provisions, requires and mandates respondent Lyons to develop an approved blood screening program to identify all children with potential lead poisoning as follows:
“ 67.9 Screening of children. The district health officer or county or city health commissioner shall develop a program approved by the State Commissioner of Health to provide for the identification of children with potential lead poisoning by a determination of the blood lead level.
“ 67.10 Evaluation of screening tests and reporting of results. All screening specimens collected according to section 67.9 shall be sent to the Division of Laboratories and Research or other laboratory designated by the State Commisisoner of Health for analysis * * * The taking and handling of such test specimens shall be in accordance with procedures specified by the State Commissioner of Health.
“ 67.11 Follow-up of positive screening results, (a) Children with blood lead levels of 50 micrograms of lead per 100 milliliters of blood, or higher, shall be immediately referred for clinical evaluation and possible treatment.
“ (b) Children with blood lead levels of between 40-49 micrograms per 100 milliliters of blood shall be rescreened within three months.
“ (c) In both of the above cases, an investigation for lead paint hazard in the children’s places of residence and frequent occupancy shall be promptly instituted according to section 67.4 of this Part.”
Upon information and belief, respondent Lyons has arbitrarily and capriciously failed, neglected and refused to initiate a screening program, approved by respondent Ingraham, to provide for *671 the identification of children with potential lead poisoning hy determination of their blood lead level, with respect to those children residing in the approximately 12,000 deteriorating dwelling units in the afore-mentioned 12 census tracts, in violation of respondent Lyons’s duty, as prescribed by law.
The gravity of the lead poisoning hazard and the pressing need for a comprehensive blood screening program was recently called to the public’s attention by a letter dated March 6,1972, written to Governor Rockefeller by 13 Albany Medical College pediatricians, who pointed out that “ Recent figures show that for every child with acute severe lead poisoning, many others in the community may .suffer from less obvious but equally dangerous chronic lead poisoning. Many cases with less pronounced symptoms escape detection.”
Upon information and belief, respondent Lyons’s only answer to the above letters was a two-paragraph response dated December 17, 1971 which briefly referred to budgetary cutbacks and constraints and stated that the County Health Department “ is doing what it can about the lead problems of Albany County ”.
Respondent Ingraham in violation of section 206 (subd. 1, pars, [b], [f], [n]) of the Public Health Law, has arbitrarily and capriciously failed, neglected and refused to require respondent Lyons to develop a blood screening program to provide for the identification of children with potential lead poisoning who reside in approximately 12,000 deteriorating dwelling units in the aforementioned 12 census tracts.
Respondents Conners, DeRusso, McGuire, .Antonucci, Mellon, McNulty and Cahill, as members of the Board of Health of the County of Albany, in violation of section 308 of the Public Health Law, have arbitrarily and capriciously failed, neglected and refused to require respondent Lyons to develop a blood screening program to provide for the identification of children with potential lead poisoning who reside in approximately 12,000 deteriorating dwelling units in the afore-mentioned 12 census tracts.
Respondents Lyons, Conners, DeRusso, McGuire, Antonucci, Mellon, McNulty, Cahill and Ingraham cross-moved for an order pursuant to subdivision (a) of CPLR 321 and subdivision (f) of CPLR 7804, dismissing the petition upon the grounds that petitioners lack standing to maintain this proceeding, the court lacks jurisdiction of the subject matter of the proceeding, the petition fails to set forth facts entitling petitioners to the relief sought or to any relief pursuant to CPLR article 78.
*672 It is the contention of respondent Commissioner Ingraham that the allegations against him are essentially directed to his general supervisory role as State Commissioner and Director of the Department of Health. He further contends that petitioners have clearly acknowledged that he has .satisfactorily performed all the- acts in other parts of the State which petitioners seek to have done in Albany.
Respondent Ingraham challenges the standing of the petitioners to maintain this proceeding against him and further challenges the sufficiency of the petition which seeks to compel him as a public officer to perform certain activities involving a significant exercise of discretion.
Respondent Ingraham relies heavily upon the decision of the Court of Appeals in Matter of Donohue v. Cornelius (17 N Y 2d 390). In that case, the court said (p. 397) as follows: ‘ ‘ While it is true that St. Clair [St. Clair v. Yonkers Raceway, 13 N Y 2d 72] involved a challenge to a legislative act, not'an executive act, and that St. Clair was a proceeding for declaratory judgment, not an article 78 proceeding, the rule of law with which we are dealing is too broad to be so easily distinguished. It is a rule of law designed to prevent the courts from giving judicial interpretations of legislative acts or executive rulings in the absence of injury or threatened injury to one’s personal rigKts. Since the petitioner in this action has demonstrated no personal injury suffered as a result of the acts complained of, and since he has made no showing to bring his case within the exception to the rule of practice under whiehrthis'court on occasion decides questions which even though moot as between the parties affect the entire State or transactions of a similar character which are-numerous and likely to arise with frequency, we are compelled to dismiss his action. (Matter of Adirondack League Club v. Board of Black Riv. Regulating Dist., 301 N. Y. 219.) ”
This court is of the opinion that this case is a long way from being moot. It is of the further opinion that a parent individually and as -a parent having legal custody of a child threatened with or already affected by a lead paint hazard is a person who has been injured or is threatened with injury to his personal rights and to his person and property.
The Court of Appeals in Matter of Donohue v. Cornelius (17 N Y 2d 390, supra) as quoted by the Attorney-General in his brief, further stated (p. 396):
“ The question, however, is governed by the recent case of St. Clair v. Yonkers Raceway (13 N Y 2d 72) and petitioner does not have a right as ,a citizen and taxpayer to bring this action.
*673 ‘ ‘ There were, of course, many cases prior to St. Glair. As early as 1821, in a suit charging public officials with failing to properly supervise a lottery, Chief Judge Spehcer reviewed the law: 1 consider the point beyond all dispute, that for a misbehavior of an officer, in his office, either for misfeasance or nonfeasance, no one can maintain an action against him, unless he can show a special and particular damage to himself.’ (Butler v. Kent, 19 Johns. 223, 226.)
“ Thereafter, several cases, notably Doolittle v. Supervisors of Broome County (18 N. Y. 155), Schieffelin v. Komfort (212 N. Y. 520), and Bull v. Stichman (273 App. Div. 311, affd. 298 N. Y. 516), defined more clearly the requirement that a person may challenge the validity of a governmental act only if it affects his private rights.
“ In Schieffelin, Judge Chase stated that it was not the intention of the people by the Constitution to confer upon the judicial branch general authority at the suit of a citizen as such to sit in review of the acts of other branches of government. The court could set aside such an act only in a controversy between litigants where it was sought to enforce personal rights — as distinguished from rights in common with the great body of people — or to enjoin, redress or punish wrongs affecting the life, liberty or property of an individual litigant. Jurisdiction is not given to the courts as guardians of the rights of the people generally against illegal acts by the executive or legislature, but when a controversy arises between litigants, the court must then follow the Constitution and may incidentally pass upon an act of the executive or legislative branches while determining the individual rights of the parties.”
As previously stated, this court is of the opinion that the petitioners are persons having personal rights, as distinguished from rights in common with the great body of people. The right that they seek to redress affects the life, liberty or property of individual litigants. This court is of the opinion that the courts of this State can no longer say that people lack standing in cases such as this where the Legislature has called for definite action to relieve major social problems affecting a definite 'class or segment of our population. We can no longer say, “ Let them eat cake.”
The courts must not assume general authority to sit in review of the acts of other branches of government, but, on the other hand, we must order action when it is called for by legislation where we find complete inaction by a branch of government that has been called upon by the Legislature to act.
*674 The Court of Appeals, as early as 1920, stated in Matter of Burr v. Voorhis (229 N. Y. 382, 387) as follows: “It is established law that it is not the office of a writ of mandamus either to confer powers or to impose duties. The writ issues to compel the performance of official duty clearly imposed by law, where there is no other adequate specific remedy. The duty must be positive, not discretionary, and the right to its performance must be so clear as not to admit of reasonable doubt or controversy.”
This court is of the opinion that the provisions in title X — Control of Lead Poisoning — of article 13 of the Public Health Law, together with the other applicable sections referred to herein, coupled with the Administrative Rules and Regulations, clearly impose official duties upon the respondents which are positive and not discretionary.
In the light of the legislative findings of fact set forth herein, it can hardly be found’ that the statutory "provisions which'the Legislature made to relieve the problem were discretionary and not mandatory.
The cross motions of the respondents are denied, with leave to answer and such answers shall be served and filed within 15 days after service of the order with notice of entry upon the attorneys for the respondents, upon the condition that, should the respondents fail to file and serve an answer within the 15 days, the petitioners may enter judgment for the relief requested in the petition. (CPLR 7804, subds. [e], [f].)